LABOR RELATIONS BOARD, ETC., Petitioner, *v.* SOCIEDAD MARIO MERCADO E HIJOS, ETC., Defendant.

No. 32. Argued December 18, 1952.—Decided February 19, 1953.

·Víctor Gutiérrez Franqui, Attorney General, Aurelio Torres Braschi, Assistant Attorney General, Hiram Cancio Vilella and Ramón Acevedo Oliveras, for petitioner. Pedro M. Porrata, Pedro E. Muñiz Ramos and Luis Torres, for defendant.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

This is a petition to enforce an arbitration award in a labor dispute. It was filed in this Court by the Labor Relations Board of Puerto Rico in the name of the Unión de Trabajadores de Factoría Núm. 35 de Guayanilla, Puerto Rico against the employer, Sociedad Mario Mercado e Hijos, which operates a sugar mill known as Central Rufina. The employer filed an answer raising certain questions of law and fact, and we held a hearing at which testimony was introduced by both parties.

On April 21, 1951 the union and the employer signed a collective bargaining agreement, retroactive to January 1,

1951 and terminating on December 31, 1951. The agreement created a Grievance Committee consisting of two employees and two employer representatives, provided that if the Committee could not agree as to the disposition of a dispute, the parties would designate a fifth member of high moral character in the community.

Ángel Tirado Torres, a greaser, and Enrique Mercado Pacheco, an assistant electrician, worked at Central Rufina until they were discharged in June, 1951 because a motor in the mill was damaged due to their alleged negligence. The parties submitted the case to the Grievance Committee. As the four members of the Committee were unable to agree on the merits of the controversy, they designated the Principal of Schools at Guayanilla as the fifth member. On June 30, 1951 the latter issued his decision which concluded as follows:

"(A) That as there is not sufficient evidence to determine if the two workers were or were not negligent, the accident is found to be fortuitous and the employees are restored to their positions;

"(B) That since the days the employees have not worked to date were a consequence of the accident, they have no option to demand payment for the same."

Alleging that the employer has refused to reinstate Tirado and Mercado as provided in the arbitration award, the Board in its petition prays that we order (1) the reinstatement of these employees and (2) the payment to them of the wages they have failed to receive since June 30, 1951.

██ The defendant contends that, in view of the above-quoted paragraph A, the arbitration award is null because "it does not decide the question in controversy that was submitted to the fifth member"; i.e., whether the employees involved were negligent or not in the performance of their duties.

The defendant is correct in asserting that an arbitration award must be sufficiently certain to dispose finally of

all the issues submitted to the arbitrator. *Labor Relations Board* v. *N. Y. & P. R. SS. Co.*, 69 P.R.R. 730, 752–3; *Magliozzi* v. *Handschumacher & Co.*, 99 N.E. 2d 856 (Mass., 1951) ; *Martin* v. *Winston,* 23 S.E. 2d 873 (Va., 1943). *Cf. Mercury Oil Refining Co.* v. *Oil Workers Int. Union, C.I.O.*, 187 F. 2d 980 (C. A. 10, 1951). But we think the award is clear in its disposition of the issue of negligence. In the first place, paragraph A must be read in the context of the entire decision. Immediately prior to paragraph A, the fifth member, after discussing the testimony in detail, makes a categorical statement that the negligence of the employees has not been proved. In the second place, even if paragraph A is read isolated from the rest of the text of the award, it means in substance that the employer has not met the burden of justifying the discharge of the employees by establishing their negligence.

It must be borne in mind that arbitration awards are frequently made as here by a layman. It would defeat the purpose of arbitration for us to require in awards technical niceties of language which are no longer imperative even in judicial decisions.[1] The award clearly exculpates the employees from any negligence which would warrant their discharge and orders their reinstatement. It therefore comforms to the requirement that an arbitration award must be sufficiently certain to dispose finally of all the issues submitted to the arbitrator.

 In discussing this point, the defendant also relies on the fact that in paragraph B the fifth member refused

---

[1] In *Knickerbocker Textile Corp.* v. *Sheila-Lynn, Inc.*, 16 N.Y.S. 2d 435 (N. Y., 1939) the court said at p. 438: "Arbitration is a salutary device. That it has become increasingly valuable and popular is explicable. It is a time and expense economizer. It relieves the Courts. It is simple, expeditious, and free from the myriad technicalities which beset and protract litigation. Its decisions possess a finality not inherent in lawsuits. It is a business-like method of resolving differences. Ergo, arbitration is to be encouraged. . . . " We think this statement is particularly apt for labor disputes. See *Labor Relations Board* v. *N. Y. & P. R. SS. Co.*, 69 P.R.R. 730.

to award any back pay to the employees for the period between the date of their discharge and the date of the award. The defendant argues that this is an implicit finding that there was negligence on the part of the employees in contradiction to the earlier finding in paragraph A that there was no evidence on which to determine the issue of negligence. We can not agree with this contention. In the absence of an express provision to the contrary in the collective bargaining agreement, the fifth member was empowered (1) to find that even if the facts on which the employer predicated the discharge were true, discharge was too drastic a penalty, and (2) to modify the penalty. *Labor Relations Board* v. *N. Y. & P. R. SS. Co.*, *supra*, p. 749. By the same token, the fifth member had the power to find that, despite the lack of negligence by the employees, they were not entitled to compensation during the time the damaged machine was being repaired. We find nothing in paragraph B which destroys the finding of paragraph A that Mercado and Tirado had not been negligent.

■ The defendant argues next that the findings of fact of the fifth member are inconsistent with the award. Here it discusses the testimony and the analysis thereof made by the fifth member in his decision. We need not stop to examine this contention, as an arbitration award, in the absence of any restriction in the agreement to arbitrate, can not be set aside for errors of judgment either as to the law or the facts. *Labor Relations Board* v. *N. Y. & P. R. SS. Co.*, *supra*, p. 746.

■ The next contention of the defendant is that it has complied with the arbitration award. This requires us to refer to the testimony adduced before us. The proof of both parties was to the effect that the defendant did nothing to put the award into effect between June 30 and October 17, 1951; that on the latter date Carlos Quirós Trujillo, Chief Examiner of the Labor Relations Board, visited the office of the defendant to investigate a complaint of the union

that the award had not been enforced; that on the same date an official of the defendant delivered to Quirós two checks in favor of Mercado and Tirado for $28.32 each, representing the pay to which they were entitled from June 30 to July 5, 1951, the date on which the crop season had terminated; and that Tirado thereafter cashed his check, but that the union had returned Mercado's check to the Board which still retained it.

However, the testimony is conflicting as to the purpose of these payments. The defendant's Auditor testified that Quirós agreed that the case would be considered as closed and settled by the payment, with the understanding that Mercado and Tirado would be restored to their positions at the beginning of the 1952 crop season. The defendant's Chief Engineer testified to the same effect, stating that "we agreed to put them back to work during the crop season because in the dead season there is no guaranty of work for anyone; the crop season ends and we are free to use them at our discretion, if we believe we can. The agreement was that in the next crop season we had to give them work again." The Chief Engineer also testified that Tirado had died before the 1952 crop season began on January 20, 1952,[2] and that Mercado was not working at the defendant's mill because he had subsequently found employment at Central Cortada.

The last witness for the defendant was its Chief Electrician, who testified that during the 1951 dead season no new employees were hired to replace Tirado and Mercado as it was easy to spread their work among the other employees during the dead season. However, he also testified that "in the dead season I used the personnel in accordance with the work, if I had a great deal of work I used them all, *if I had a small amount of work I divided the time among them.*"

---

[2] The parties thereafter stipulated that Tirado had died on February 22, 1952.

(Italics ours.) He stated that Mercado, who used to work with him, was included in this division of work during dead seasons prior to 1951. He also testified that in the 1952 crop season he had replaced Mercado with a new man.

Quirós was the first witness for the petitioner. He testified that at the conference with officials of the defendant on October 17, 1951 he asked them to reinstate Tirado and Mercado. One of the officials replied that this could not be done as all work in the mill had ceased on July 5 and that even if Tirado and Mercado had been reinstated on June 30, their employment would have terminated on July 5. Quirós insisted that in any event the defendant owed these two employees compensation for six days, from June 30 to July 5. The official of the defendant asked if the defendant was required to reinstate them at the beginning of the 1952 crop season. Quirós replied that this question would be settled later, but that what was pending at the time was payment for the six days.

Quirós testified further that he was given the two checks, but that he refused to permit counsel for the defendant to put on the back of the checks a statement that it was in complete payment of all wages owed to Tirado and Mercado and was a definite settlement of the case. He specifically stated that it constituted only payment for six days, and nothing more. Neither he nor any one else at the time made any commitment as to reinstatement of these two employees at the beginning of the 1952 crop season.

Quirós testified that he waited to raise the question again until Tirado wrote the Board a month later that he would not accept the check because it did not reflect the amount to which he was entitled as his department was continuing to work during the dead season. Quirós concluded that Tirado and Mercado were entitled to be reinstated during the dead season because his investigation of the defendant's payrolls showed that they worked in the dead season in previous years. He testified that "Some used to work 40 hours a

week, others 20, 10, 15, but there are periods during previous years when the entire personnel of the department worked."

Ferdinand Quintana, an employee of the mill, testifying for the petitioner, stated that Mercado had worked with him until the latter was replaced by Celestino González, who did repair work for motors and electricity during the 1951 dead season, which in previous years had been done by Mercado among others. He also testified that Tirado had worked during dead seasons prior to 1951 "in accordance with the work they had."

We assume without deciding that Quirós was authorized to settle the case on behalf of Tirado and Mercado. But we reject the testimony of the defendant that in effect such a settlement occurred. On the contrary, we give credence to the testimony of Quirós that under the circumstances he undertook merely to accept the checks covering the six days' work for which the defendant admitted liability, leaving open temporarily the question of reinstatement.

In view of our determination that no settlement was made in this case, we turn to the question of whether the defendant has complied with the award itself. On the issue of reinstatement, the testimony before us is clear (1) that prior to 1951 both Tirado and Mercado worked during the dead season to the extent that work was available for them, and (2) that such work continued to be done by others during the 1951 dead season. It follows that the defendant was obligated under the award to reinstate Tirado and Mercado on June 30, 1951 and to give them after July 5, 1951 the proportion of available work they customarily had in previous dead seasons. We therefore cannot agree with the defendant that it has complied with the arbitration award.[3]

---

[3] This result is in accordance both with the practice of the defendant and a clause of the collective bargaining agreement which requires the employer to distribute the work during the dead season in the most equitable manner possible in order to benefit the greatest possible number of employees, taking into consideration their previous employment by the employer.

■ The defendant also argues that the Board is estopped by its voluntary acts from requesting the enforcement of the award. It is doubtful if the doctrine of equitable estoppel on which the defendant relies would apply here even if we had believed the testimony of the defendant's witnesses. See *Hopgood* v. *Porto Rican and American Ins. Co.*, 60 P.R.R. 322, 327–8; cases cited in 19 Am.Jur. pp. 634–5 But we never reach this question inasmuch as we have rejected the testimony on which the defendant predicates this contention.

■ Finally, the defendant argues that in any event the award does not bind it beyond December 31, 1951, the date on which the collective bargaining agreement expired. But, as we pointed out in *Labor Relations Board* v. *N. Y. & P. R. SS. Co.*, *supra*, p. 745, "An arbitrator's award is neither a contract nor a judgment, but it partakes of the nature of both." If the issue which was arbitrated arose under and during the life of the collective bargaining agreement, an award in favor of an employee cannot be frustrated by a delay in compliance by the employer until expiration of the agreement.

Here if the defendant had complied with the award on June 30, 1951, no issue would have arisen as to the rights of Mercado and Tirado to be employed during 1952 and 1953. We cannot permit the defendant to take refuge in the violation of its contract, particularly in the absence of some showing that by virtue of a new collective agreement or some other reason Mercado and Tirado were not eligible for employment by it after January 1, 1952. We were not persuaded by a somewhat similar argument when we rejected the contention of an employer in an unfair labor practice case that the Board could order him to bargain collectively only for the crop season of the year in which he committed the unfair labor practice of refusing to bargain. *Rivera* v. *Labor Relations Board*, 70 P.R.R. 5, 15. And see *Lane* v. *Endicott Johnson Corporation*, 75 N.Y.S. 2d 171 (N. Y., 1947);

*Motor Haulage Co.* v. *International Brotherhood, etc.,* 69 N.Y.S. 2d 656 (N. Y., 1947).

The petition to enforce the award requests both reinstatement and back pay. We shall order reinstatement only as to Mercado since the record shows that Tirado died on February 22, 1952. As to back pay, the defendant will be ordered to pay the amounts Mercado and Tirado would have received, less their net earnings, if any, elsewhere during the period involved or less the amounts, if any, which they failed without excuse to earn in other available employment. The exact amounts due are left as in the past to the administrative machinery of the Board, with the cooperation of the employer, whose payrolls will serve as a basis for the final computation. *Labor Relations Board* v. *N. Y. & P. R. SS. Co., supra,* p. 762; *Rivera* v. *Labor Relations Board, supra,* pp. 12–13.[4]

Mr. Justice Negrón Ferndández and Mr. Justice Ortiz did not participate herein.

---

[4] We need hardly add that any claim by Tirado's heirs, if any, for back pay is valid only for the period between June 30, 1951 and February 22, 1952. Also, in both cases compensation for dead season periods will necessarily embody an estimate of the proportion of the available work which would have been assigned to Mercado and Tirado during such dead seasons.